IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION


JOHN DOE, JOHN DOE 2, and JOHN DOE 3;

               Plaintiffs;

      v.

JOSEPHINE COUNTY;

               Defendant.

_____

JOHN DOE 5, JOHN DOE 6, and JOHN DOE 7;

               Plaintiffs;

      v.

JOSEPHINE COUNTY;

               Defendant.

_____

Case No. 1:12-cv-02080-CL
Consolidated with:
1:13-cv-00825-CL
1:13-cv-00724-CL


**REPORT &
RECOMMENDATION**

/ / /

/ / /

/ / /

JACK DOE, JACK DOE 3, and JACK
DOE 4;

                      Plaintiffs;

          v.

JOSEPHINE COUNTY;

                    Defendant.

_____

CLARKE, Magistrate Judge.

      Plaintiffs filed these consolidated cases against Defendant Josephine County ("Defendant") for negligence, vicarious liability, and violations of 42 U.S.C. § 1983 based on allegations that Plaintiffs were sexually abused as children by Ray Luckey[1] ("Luckey"), a former juvenile probation officer of Defendant. Currently before the Court are the parties' cross-motions for summary judgment (#144, #146, #150, #153, #162, #167, #171, #173, #175, #177) and Plaintiffs' motion to strike (#268). For the reasons set forth below, the Court should DENY Plaintiffs' motion for partial summary judgment (#167), GRANT in part and DENY in part Defendant's summary judgment motions (#144, #146, #150, #153, #162, #171, #173, #175, #177), and DENY Plaintiffs' motion to strike (#268).

## PRELIMINARY EVIDENTIARY MATTER

      Plaintiffs move to strike (#268) portions of declarations submitted by Defendant in opposition to Plaintiffs' summary judgment motion. Plaintiffs object to the declarations on the ground that they contain unsupported speculation. Specifically, the declarants state that they do not recall receiving reports of Luckey's misconduct but then go on to theorize what actions they would have taken if they had heard such allegations. Defendant has not filed a response.

---

[1] Luckey is deceased. He committed suicide in 1994 during a state investigation of his alleged sexual crimes against children.

Although it is uncontested that portions of the declarations are speculative, Plaintiffs' evidentiary objections are superfluous in the summary judgment context. *See Burch v. Regents of Univ. of California*, 433 F.Supp.2d 1110, 1119 (E.D. Cal. 2006) ("[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself."). A court may award summary judgment only if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Unsupported speculation in Defendant's declarations regarding what the declarants "would have" done "if" they had been informed of Luckey's inappropriate behavior does not constitute fact and thus cannot create a genuine issue for trial. *Anheuser–Busch, Inc. v. Natural Beverage Distributors*, 69 F.3d 337, 345 (9th Cir. 1995) ("[C]onclusory or speculative testimony is insufficient to raise a genuine issue of fact to defeat summary judgment."); *Burch*, 433 F.Supp.2d at 1119 ("[S]tatements in declarations based on speculation or improper legal conclusions, or argumentative statements, are not facts and likewise will not be considered on a motion for summary judgment."). Consequently, Plaintiffs' motion to strike is redundant and should be denied as moot.

## FACTUAL BACKGROUND

### I.    Plaintiffs' Testimony Regarding Luckey's Sexual Abuse.

Plaintiffs' personal stories, detailed below, are not in dispute. Stated differently, both parties offer Plaintiffs' depositions and Defendant mounts no evidence to contradict the Plaintiffs' testimony. Instead, in its reply briefing, Defendant characterizes portions of Plaintiffs' testimony as "simply unbelievable" and reminds the Court that Defendant generally denied Plaintiffs' allegations in its answer. However, denials in pleadings are not sufficient to contradict

specific evidence offered at the summary judgment stage. *Celotex Corp.*, 477 U.S. at 324 (If the moving party shows the absence of a genuine issue of material fact, the non-moving party must "go beyond the pleadings" and set forth specific facts showing that there is a genuine issue for trial.).

### a.  John Doe 1

In 1992, at age 13, John Doe 1 was found guilty of criminal mischief and assigned to Luckey as his juvenile probation officer. #145-1, at 24:15-18; 25:8-12; 26:2-4. Prior to his assignment, boys at a halfway house had told John Doe 1 that Luckey molested young men. #145-1, at 28:15-29:16. John Doe 1 first met Luckey at his office where Luckey rubbed John Doe 1's shoulders in a sensual manner and pressed his groin against the small of John Doe 1's back. #145-1, at 27:2-28:3. Thereafter, the two primarily met at Luckey's home or in Luckey's car. #145-1, at 35:6-12; 38:11-16. Luckey represented to John Doe 1's mother that John Doe 1 was coming over to his house to complete his homework. #145-1, at 31:1-6. During these visits, Luckey sexually abused John Doe 1, forcing the boy to engage in acts of oral and anal intercourse. #145-1, at 32:1-6; 41:3-21. John Doe 1 was disgusted by the interactions and knew they were wrong. #145-1. At 33:2-11. However, he did not report them to anyone. #145-1, at 33:15-19. John Doe 1 explains Luckey constantly reminded him that he was under Luckey's control and that Luckey could easily send him to MacLaren Youth Correctional Facility. #145-1, at 33:20-25. John Doe was under the impression that, if he told anyone about the nature of their relationship, Luckey would separate him from his parents and send him into a boys' home or foster care. #145-1, at 34:1-9. John Doe 1 was also ashamed and afraid of how his family, peers, and the small community would react. #145-1, at 43:19-24. John Doe 1 was last abused by Luckey in 1994. #145-1, at 40:13-18.

An Oregon State Police Detective interviewed John Doe 1 in 1994. #145-1, at 13:1-17. The detective asked John Doe 1 whether Luckey ever sexually abused him. #145-1, at 14:10-12. John Doe 1 denied any sexual abuse, stating that he would never allow something like that to happen. #145-1, at 14:15-16.

John Doe 1 has suffered from anxiety, depression, insomnia, substance abuse, and severe post-traumatic stress disorder ("PTSD"). #195, ¶ 2. He has spent time in prison for crimes related to substance abuse and domestic violence. # 195, ¶ 2. John Doe 1 first recognized the link between his existing problems and the sexual abuse he endured as a child when he read of a fellow probationer's suicide in the newspaper.[2] #195, ¶ 3. He did not realize until that time that the County might have been aware that Luckey was a child molester and failed to take action to protect his probationers. #195, ¶ 4.

### b.  John Doe 2

In 1988, at age 13, John Doe 2 was convicted of sexually abusing a young girl. #151-1, at 8:7-24. Luckey was assigned to be his probation officer. #151-1, at 8:7-24. Luckey sexually abused John Doe 2 on multiple occasions. Luckey masturbated the boy at a movie theatre, forced the boy to masturbate him during another trip to a movie theatre, and engaged the boy in oral sex when he spent the night at Luckey's home. #151-1, at 15:1-4; 16:16-21; 17:17-21. Luckey told John Doe 2 not to tell anyone and warned him that he had the power to take him away from his family. #151-1, at 15:21-24. John Doe 2 did not report the abuse. #151-1, at 16:11-12; 17:13-15; 18:15-17. At some point, John Doe 2's parents grounded him and he was no longer allowed to go to places like the movies. #151-1, at 20:14-24. Thereafter, John Doe 2 met with Luckey in his office until he was sent to Hillcrest Youth Correctional Facility. #151-1, at 20:18-24.

---

[2] John Doe 1 does not indicate when he read of the death. The probationer committed suicide on December 5, 2010. Sullivan Decl. Ex. S, at 10:7-13.

In 2012, John Doe 2 read an article in the Daily Courier about Luckey. #196, ¶ 3. At that time, he realized many of the problems he has struggled with as an adult — including anxiety, depression, flashbacks, shame, and low self-worth — were caused by his experience with Luckey. #196, at ¶¶ 2-3. In addition, he realized the County might be liable for Luckey's conduct. #196, at ¶ 4.

### c.  John Doe 3

Luckey began to make sexual advances toward John Doe 3 shortly after becoming his probation officer is 1984. #154-1, at 7:11-8:6; 10:10-12. Luckey took John Doe 3 to a movie and, while there, massaged John Doe 3's inner thigh. #154-1, at 12:13-23. On multiple occasions, after playing racketball, Luckey and John Doe 3 showered together and fondled one another. #154-1, at 14:3-15:6. Luckey took John Doe 3 to his home and John Doe 3 masturbated him. #154-1, at 15:19-16:11. John Doe 3 was under the impression that he would be sent to MacLaren if he didn't do what Luckey asked of him. #154-1, at 17:1-9. He did not tell anyone about the abuse. #154-1, at 23:3-6. In 1985, John Doe 3 asked his mother if he could request a new probation officer. #154-1, at 7:11-8:6; 19:2-5. He told her that Luckey was "weird." #154-1, at 19:7-11. His mother was resistant but ultimately agreed that he could. #154-1, 20:22-21:4.

As an adult, John Doe 3 has suffered from substance abuse, anxiety, depression, nightmares, embarrassment, and PTSD. #197, ¶ 2. He has spent time in jail and prison for substance abuse and theft. #197, ¶ 2. In 2012, John Doe 3 read an article in the Daily Courier about Luckey. #197, ¶ 3. At that time, he realized there is a causative connection between Luckey's sexual abuse and the many issues John Doe 3 has struggled with an adult. #197, ¶ 3. He also realized the County might have been aware of Luckey's behavior and failed to step in to protect probationers. #197, ¶ 4.

### d. John Doe 5

Luckey was assigned as John Doe 5's probation officer when John Doe 5 was 14 or 15 years old. #147-1, at 10:19-11:4. Luckey sexually abused John Doe 5 on four occasions. First, he picked the boy up from a shelter, took him home to his house, and anally raped him. #147-1, at 21:7-22:22. John Doe 5 cried and Luckey "spent the next hour talking to [John Doe 5] about how [Luckey] was in charge of [his] life and that [John Doe 5] could probably go home if [he] did what [Luckey said], or it could get worse for [him] if [he] didn't." #147-1, at 22:14-17. John Doe 5 did not tell anyone about the incident because he was scared, ashamed, and "didn't want [his] life to get worse." #147-1, at 23:20-25. Luckey sexually abused John Doe 5 on three more occasions in Luckey's car and home. #147-1, at 24:19; 27:5-10; 28:11-20. At age 16, John Doe 5 was reassigned to a different probation officer. #147-1, at 11:10-12:4. He had no further contact with Luckey. #147-1, at 11:10-12.

In late 2012, John Doe 5 read an article in the Daily Courier regarding Luckey's sexual abuse. #198, ¶ 3. It made him realize that his experience with Luckey contributed to many of his problems in adulthood; including anxiety, depression, shame, PTSD, and substance abuse. #198, ¶¶ 2-3. It also alerted him to the County's possible liability for his injuries. #198, ¶ 4.

### e. John Doe 6

In 1985, when John Doe 6 was 15, a boy invited him over to Luckey's home. #174-1, at 17:16-18-1; 23:16-22. The boy told John Doe 6 that Luckey was a probation officer. #174-1, at 19:1-5. When the boys walked into the home, John Doe 6 saw Luckey being masturbated by another young boy in an adjacent room. #174-1, at 19:6-8. Luckey quickly approached John Doe 6 with his penis exposed and his hand on his holstered gun. #174-1, at 19:9-13. Luckey pinned the boy against the wall. #174-1, at 19:12. Luckey humped John Doe 6, running his gun along

the side of his body. #174-1, at 19:16-21. John Doe 6 told Luckey to get his hands off of him and threatened to tell his uncle, a local sheriff deputy. #174-1, at 19:14-23. Luckey asked John Doe 6 who he thought his uncle would believe and threatened to get him in trouble on a false charge, become his probation officer, and ruin his uncle's career. #174-1, at 20:4-11. Luckey masturbated John Doe 6 through his pants and forced the boy to masturbate him. #174-1, at 20:10-20. John Doe 6 never reported the incident because he was afraid for his life and did not want to be labeled a homosexual. #174-1, at 27:10-12; 30:15-18. John Doe 6 dropped out of high school to avoid running into the boy who took him to Luckey's house. #174-1, at 15:16-17:18.

Until John Doe 6 read an article in the Daily Courier about Luckey in late 2012, he did not realize that Luckey's abuse had caused his existing problems including substance abuse, depression, nightmares, and PTSD. #199, ¶¶ 2-3. Nor did he realize the County's potential liability for Luckey's actions. #199, ¶ 4.

### f. John Doe 7

In his younger adolescence, John Doe 7 was involved in some school fights and petty thefts. #176-1, at 9:11-19. At age 14, he became a ward of the state and was placed on probation. #176-1, at 9:11-19. Luckey was assigned to be his probation officer. #176-1, at 11:10-12. John Doe 7 first began to feel uncomfortable with Luckey when he would hug him in an inappropriately intimate manner at the end of office visits. #176-1, at 12:2-8. Luckey took John Doe 7 to the Rogue Valley Courts to play racquetball. #176-1, at 12:17-18. Luckey convinced the boy that it was customary to get into the club's hot tub naked. #176-1, at 12:19-23. Luckey would sit next to John Doe 7 in the tub and touch him inappropriately. #176-1, at 13:17-14:8. On two occasions, Luckey performed oral sex on the boy in the club's public locker room. #176-1, at 15:9-23; 16:21-17:4. Luckey indicated to John Doe 7 that his probation would be more lenient

if he went along with Luckey's wishes and didn't tell anyone. #176-1, at 14:23-15:3. John Doe 7 never reported the abuse because he was ashamed, scared, and worried that he would be taken away. #176-1, at 19:2-10.

When John Doe 7 was 17, Luckey transported him to Pitchford Boys Ranch. #176-1, at 10:7-16. Luckey informed the boy that he would not have had to go to Pitchford if he had been more "easygoing" and done the things Luckey asked of him. #176-1, at 18:15-19. John Doe 7 never saw Luckey again. #176-1, at 11:2-9.

As an adult, John Doe 7 has suffered from substance abuse, depression, anxiety, and anger. #200, ¶ 2. He has spent time in prison for crimes related to substance abuse, domestic violence, and assault. #200, ¶ 2. He did not realize the link between his problems as an adult and the abuse he endured as a child until he read an article in the Daily Courier about Luckey in 2012. #200, ¶ 3. He also did not realize the County's potential liability until that time. #200, ¶ 4.

### g.  JT

When JT was about 14 years old, he got into trouble for breaking into a home and stealing jewelry. #163-1, at 17:5-12; 18:21-23. He was placed on probation for one year. #163-1, at 18:12-20. Luckey was his probation officer. #163-1, at 18:10-11. On six or seven occasions, Luckey invited JT to his apartment, served him wine, fondled him, and forced him into oral and anal sex. #163-1, at 20:21-21:11; 25:6-26:23. Afterward, Luckey would open the door and look both ways before sending JT out. #163-1, at 21:19-20; 27:2-8. Sometimes, JT would bleed and was "deathly afraid of getting AIDS." #163-1, at 27:20-23. JT never told his parents. #163-1, at 24:19-24; 30:10-12. After JT's probation ended, he did not see Luckey again. #163-1, at 19:2-5.

JT first realized the connection between his adult problems — including substance abuse and depression — and his experience with Luckey in April 2014 when he was contacted by an

investigator. #202, ¶¶ 2-3. That was also the first time he realized that the County might be liable for his injuries. #202, ¶ 4.

### h.  JJ

JJ first met Luckey in 1985 or 1986 when Luckey picked him up from Star Gulch Boys Ranch and transported him to the Inn Between, a non-lock up residential center for troubled youth. #172-1, at 13:9-12; 24:4-25:3; 56:7-14. Luckey was JJ's probation officer. #172-2, at 31:7-19. A few weeks after placing JJ at the Inn Between, Luckey dropped by, picked JJ up, and took him to his office. #172-2, at 31:23-32:23. JJ asked to use the bathroom. #172-1, at 33:2-3. Luckey followed JJ into the bathroom, held him against the wall, and warned him that he was "[two] seconds aware from being sent to MacLaren." #172-1, at 33:4-9. Then, Luckey fondled and anally raped JJ. #172-1, at 34:7-13; 36:16-23. JJ cried in the bathroom while he cleaned himself up and returned to Luckey's office. #172-1, at 37:28-38:7. Luckey was sitting behind his desk and asked JJ "Are you going to behave now?" #172-1, at 38:6-10. JJ did not report the incident out of fear of being sent to MacLaren. #172-1, at 39:7-11. About a month later, Luckey took JJ and a group of boys to an event and then back to his house. #172-1, at 39:17-21; 57:15-18. JJ separated from the group and ran away. #172-1, at 39:22-41:16. JJ never saw Luckey again. #172-1, at 57:18.

JJ was contacted by an investigator in March 2013. #203, ¶ 3. From that contact, he realized the connection between the sexual abuse by Luckey and his problems with substance abuse, depression, anger, and suicidal thoughts. #203, ¶ 3. He also realized that the County might be liable for his injuries. #203, ¶ 4.

### i.  Jack Doe 3

Luckey became Jack Doe 3's probation officer in 1990, after Jack Doe 3 was caught breaking into a convenience store to steal cigarettes and beer. #178-1, at 20:18-21:5. Jack Doe 3 was 14 years old. #178-1, at 21:1. He was placed on probation for one year. #178-1, at 24:14-16.

Luckey gave Jack Doe 3 his phone number and told him to call him if he ever needed a ride. #178-1, at 30:7-12. Late one evening, Jack Doe 3 found himself stranded in Grants Pass, five miles away from his home. #178-1, at 30:13-25; 31:16-17. Jack Doe used a payphone to call Luckey and ask him for a lift. #178-1, at 30:17-20. Luckey obliged. #178-1, at 30:22. Rather than taking the freeway, Luckey took back roads and explained to Jack Doe 3 that he needed to check on another student who had called him. #178-1, at 31:21-32:13. Luckey drove to a remote location that Jack Doe 3 estimates was about 20 miles away from his house. #178-1, at 32:15-33:11. Luckey stopped and told Jack Doe 3 that he liked him and wanted to have sex with him. #178-1, at 33:12-18. Jack Doe 3 said no. #178-1, at 33:19-21. Luckey told the boy that the only way he was going home was if he did what he was told. #178-1, at 33:23-24. The boy began to cry. #178-1, at 33:25-34:1. Luckey forced Jack Doe 3 to take off his pants, took him out of the car, and anally raped him. #178-1, at 34:3-35:8. Jack Doe 3 cried for about a half an hour and then Luckey took him home. #178-1, at 37:10-21. Jack Doe 3 did not tell anyone about the night because he was ashamed. #178-1, at 38:12-39:1.

About a month later, Luckey gave Jack Doe 3 a ride home from an office visit. #178-1, at 40:13-18. While parked at the bottom of Jack Doe 3's driveway, Luckey fondled and performed oral sex on the boy and made Jack Doe 3 perform oral sex on him. #178-1, at 40:21-41:25. Luckey told Jack Doe 3 that he would send him to MacLaren if he didn't do what Luckey said. #178-1, at 2-12.

Jack Doe 3 never saw Luckey again after his probation ended. #178-1, at 25:4-13. He was not aware of the Oregon State Police investigation into Luckey and he was never interviewed in connection with it. #178-1, at 67:22-68:5.

As an adult, Jack Doe 3 has suffered from substance abuse, anxiety, depression, anger, and insomnia. #201, ¶ 2. He attempted suicide in 2004. #201, ¶ 2. In November 2013, Jack Doe 3's probation officer told him that he wanted to form a relationship with him. #201, ¶ 3. This statement triggered Jack Doe 3 to realize a connection between his existing problems and the abuse he suffered at the hands of his juvenile probation officer. #201, ¶ 3.

## II. Evidence Regarding Whether Defendant was Aware of Luckey's Conduct.

Terry Soeteber was the director of County's juvenile justice department from 1973 to 2000. Sullivan Decl. Ex. J, at 16:20-17:8. Mr. Soeteber wrote and regularly revised an office policy and procedure manual. Sullivan Decl. Ex. J, at 50:16-25. He does not remember whether the manual set forth rules governing probation officers' contact with probationers. Sullivan Decl. Ex. J, at 52:5-21. However, Mr. Soeteber said it was understood within the department and the greater field of juvenile corrections that officers should not invite probationers into their homes, take probationers out to the movies, take probationers on vacations, or give probationers gifts. Sullivan Decl. Ex. J, at 53:6-64:9; 54:25-55:16; 55:22-56:1; 56:23-57:13. Such activities would conflict with the professional nature of the probation officer-probationer relationship. Sullivan Decl. Ex. J, at 55:7-21. By 1991, the department distributed guidelines for permitted contacts between probation officers and probationers to newly hired officers. Sullivan Decl. Ex. L, at 24:22-26:25. These rules of conduct were well known and openly discussed within the department. Sullivan Decl. Ex. L, at 27:15-22.

According to Maureen Crumrine, a long-time juvenile department employee and

probation officer for a short stint during the early to mid-1980s, probation officers generally understood that it would be inappropriate to invite a probationer into their homes, take them on trips, or buy them gifts. Sullivan Decl. Ex. K, at 7:14-19; 12:6-15; 25:5-11; 30:23-31:6; 33:13-19. From time to time, Ms. Crumrine saw Luckey with teenage boys at fast food restaurants and high school sporting events. Sullivan Decl. Ex. K, at 34:1-14. She assumed the boys were on his caseload. Sullivan Decl. Ex. K, at 36:6-13. Luckey told Ms. Crumrine that he had boys over to his house to do yard work and earn restitution money. Sullivan Decl. Ex. K, at 47:8-21.

Wallace McConnell, Jr. was a County employee from 1977 to 2001. Sullivan Decl. Ex. M, at 8:3-9:2. He worked as a deputy sheriff and was assigned to patrol federal lands. Sullivan Decl. Ex. M, at 8:9-11. Mr. McConnell was good friends with Luckey. Sullivan Decl. Ex. M, at 13:1-2. He recalls that boys would accompany Luckey around town and visit Luckey's personal residence. Sullivan Decl. M, at 19:6-8; 21:8-11. Boys would perform chores, like raking leaves, at Luckey's home to earn spending money. Sullivan Decl. Ex. M, at 19:18-23. One probationer visited Luckey's house "quite frequently" and occasionally spent the night. Sullivan Decl. Ex. M, at 21:1-5; 22:4-18.

Judy Erickson worked as a deputy sheriff for the County from 1982 to 2003. Sullivan Dec. Ex. N, at 8:6-18. She was also Luckey's neighbor. Sullivan Decl. Ex. N, at 9:5-12. Ms. Erickson saw boys over at Luckey's home regularly. Sullivan Decl. Ex. N, at 10:7-20.

> [S]ometimes they would come and go right in the house, sometimes they would come and they would sit in the yard. Sometimes they would have on their Speedos and be sunbathing in chaise lounges and rubbing each other with suntan oil. And then they would go into the house. Sometimes I would see this, I think this one kid drove a pickup, a little pickup, like a little S-10, or something like that; and sometimes his truck would be there the next morning.

Sullivan Decl. Ex. N, at 10:22-11:5. Based on these observations, Ms. Erickson began to worry

that Luckey might have a sexual attraction to teenage boys. Sullivan Decl. Ex. N., 16:3-5. Regarding whether she reported her concerns Ms. Erickson surmises:

> I mentioned it, like I said, I'm sure that I probably talked to my supervisor, Donna [Lasater]. And maybe I sort of remember talking about it with Dan Calvert, he was a corporal then. And we spent time on patrol, I would go out on my lunch hour and ride with him on patrol. And I'm sure we talked about it. I think he was one of the ones who felt like Ray was just a nice guy and just was concerned for the boys, and wanted to take them rafting and doing things that they didn't have the opportunity to do.

Sullivan Decl. Ex. N, at 25:11-22. Mr. Calvert and Ms. Lasater both testify that they did not hear of Luckey's misconduct from Ms. Erickson or anyone else until allegations surfaced publicly. Calvert Decl., at 4.; Lasater Decl., at 2.

Gayle Luckey was married to Luckey from 1982 to 1985. Sullivan Decl. Ex. O, at 7:8-22. Mrs. Luckey recalls that Luckey's probationers visited their home "a number of times." Sullivan Decl. Ex. O, at 28:23-29:11. One probationer in particular came over "quite often." Sullivan Decl. Ex. O, at 29:17-21. That probationer told Mrs. Luckey that Luckey had paid for his graduation cap, gown, and pictures and brought him a dozen roses at school. Sullivan Decl. Ex. O, at 31:23-32:6. Mrs. Luckey learned that another probationer had lived with Luckey prior to their marriage and that Luckey had bought him a motorcycle and a leather coat. Sullivan Decl. Ex. O, at 34:1-35:20.

Mrs. Luckey worked as a counselor at the Inn Between. Sullivan Decl. Ex. O, at 16:12-25. From time to time, Mrs. Luckey encountered Luckey's probationers in her professional capacity. Sullivan Decl. Ex. O, at 39:4-6. She recalls some boys mentioned that Luckey took them on overnight trips. Sullivan Decl. Ex. O, at 39:4-22. The boys also told Mrs. Luckey that Luckey threatened to send them to MacLaren if they didn't do what he asked. Sullivan Decl. Ex. O, at 40:19-22.

Mrs. Luckey described Luckey as a "control freak with the kids." Sullivan Decl. Ex. O, at 32:18-24. She was concerned that his interactions with probationers were unethical and unprofessional and that Luckey was using his position of power to manipulate the boys. Sullivan Decl. Ex. O, at 33:2-16. Mrs. Luckey approached her supervisor at the Inn Between and asked him if he would talk to Mr. Soeteber, Luckey's supervisor, about Luckey's conduct. Sullivan Decl. Ex. O, at 41:16-42:6. Mrs. Luckey does not think her supervisor spoke to Mr. Soeteber about her concerns because nothing changed. Sullivan Decl Ex. O, at 42:10-15. Mr. Soeteber testified that he did not learn of Luckey's rule violations or alleged abuse until the events giving rise to the Oregon State Police investigation. Sullivan Decl. Ex. J, at 100:18-102:13.

Tracy Allen worked as a supervisor at the Inn Between from 1984 to 1991. Allen Decl. ¶ 1. She recalls that Mr. Soeteber and other County juvenile department team members regularly visited the Inn Between because their probationers were in residence. Allen Decl. ¶ 1. Ms. Allen had the strong impression that Luckey had an unusual interest in boys. Allen Decl. ¶¶ 3, 11. She recalls:

> He acted as if he was a teenager who had a crush on a boy. For example, I recall he brought a favorite boy under his supervision a long-stem red rose, while the boy was at the facility. He would act like a 14-year-old himself around this particular favorite boy. He would say things like, "Oh gosh, you, you got in trouble again. What are we going to do now?

Allen Decl. ¶ 3. Luckey would drop by the Inn Between on evenings and weekends and take boys out overnight as if he was "dating" them. Allen Decl. ¶ 7. Allen overheard Luckey telling boys that he controlled their lives and could send them to MacLaren. Allen Decl. ¶ 4. Allen reported her concerns to her supervisor, Mr. Burgess. Allen Decl. ¶ 5. However, she refrained from telling others because she believed everyone already knew and she was intimidated by Luckey's close relationship with local law enforcement which Ms. Allen describes as a "good

old boys club." Allen Decl. ¶ 11.

In 1981, Myrna Rafalovich's seventh grade son told her that a man had invited him to a soccer game. Sullivan Decl. Ex. Q, at 11:11-23. Ms. Rafalovich told her son that the man had to come over and meet her before he could take him anywhere. Sullivan Decl. Ex. Q, at 12:2-11. Later that day, Luckey came over and met Ms. Rafalovich. Sullivan Decl. Ex. Q, at 12:12-25. She struggled to engage him in conversation: "He was squirming. He wouldn't look me in the eye. He was a very nervous man." Sullivan Decl. Ex. Q, at 14:1-7. Ms. Rafalovich asked Luckey why he had contacted her son and Luckey responded that he had noticed he was new in town and thought he might need some guidance. Sullivan Decl. Ex. Q, at 15:2-6. Ms. Rafalovich told Luckey that it was inappropriate for him to contact her son and that he was not allowed to go with him. Sullivan Decl. Ex. Q, at 15:8-12. Luckey "scurried right out" of her house. Sullivan Decl. Ex. Q, at 15:13-15.

Mrs. Rafalovich was trained in child predator detection and she thought Luckey exhibited some worrisome tendencies. Sullivan Decl. Ex. Q, at 8:6-12; 21:10-15. After their initial meeting, Ms. Rafalovich saw Luckey out regularly with a boy at fancy restaurants, movie theatres, etc. Sullivan Decl. Ex. Q, at 20:1-22. In 1984, Ms. Rafalovich approached Harold Haugen, a County Commissioner and fellow parent, about her concerns. Sullivan Decl. Ex. Q, at 23:4-24:25; 29:2. She met Mr. Haugen in a social setting and told him that, based on her background with child abuse, she was concerned about Luckey's behavior toward youth. Sullivan Decl. Ex. Q, at 24:3-9. She told Mr. Haugen that she had an unnerving interaction with Luckey when she first moved to town and frequently saw him around town socializing with a teenaged boy. Sullivan Decl. Ex. Q, at 26:7-17. Mr. Haugen responded that Luckey had a reputation for being "really good with kids." Sullivan Decl. Ex. Q, at 27:10-15. The conversation

did not go any further. Sullivan Decl. Ex. Q, at 27:12-25. Mr. Haugen does not recall this interaction. Haugen Decl., at 3. Prior to Luckey's suicide, Mr. Haugen testifies that he had never heard that Luckey was acting inappropriately with teenagers. Haugen Decl., at 3.

Witness X worked for the County from 1987 to 1994. Sullivan Decl. Ex. R, at 7:1-8:9. X's son got into trouble and Luckey was assigned as his probation officer. Sullivan Decl. Ex. R, at 9:6-21; 12:8-11. X's son told her that Luckey was "messing around with some of the boys." Sullivan Decl. Ex. R, at 10:1-10. X interpreted this to mean that Luckey was molesting his probationers. Sullivan Decl. Ex. R, at 10:10. X immediately related her son's statements to a deputy district attorney who was handling sexual abuse cases. Sullivan Decl. Ex. R, at 10:23-11:22; 13:3-6. X is unsure what, if anything, was done to investigate her son's allegations. Sullivan Decl. Ex. R, at 15:2-21. Neither of the deputy district attorneys that X believes she talked to recall her making such a report. Thompson Decl., at 4; Johnson Decl., at 4.

In or around 1989, Luckey was assigned as the probation officer of Mary Hughes's son. Sullivan Decl. Ex. S, at 14:12-15:13. Ms. Hughes' son spent a lot of time at Luckey's house. Sullivan Decl. Ex. S, at 23:14-19. Sometimes, he spent the night. Sullivan Decl. Ex. S, at 24:2-8. "He was always picking him up, taking him shopping, buying him clothes, taking him to the coast for the weekend, taking him to fancy dinners . . . having him at the house all the time." Sullivan Decl. Ex. S, at 24:19-22. One day, Ms. Hughes' son told her that Luckey had asked him to move in and marry him when he turned 18. Sullivan Decl. Ex. S, at 26:13-20. The boy was distraught and contemplated suicide. Sullivan Decl. Ex. S, 26:13-24. Ms. Hughes called the probation office and informed them that Luckey was having her son sleep over, buying him gifts, taking him to dinner, and proposing marriage to him. Sullivan Decl. Ex. S, at 27:4-20. The office representative responded that Luckey was simply a nice person who was befriending her son.

Sullivan Decl. Ex. S, at 27:11-13. Ms. Hughes called the office repeatedly to express her concerns. Sullivan Decl. Ex. S, at 32:7-17. On at least one occasion, she discussed Luckey's conduct with the head of the department, Mr. Soeteber. Sullivan Decl. Ex. S, at 32:18-20; 34:8-15. Eventually, Ms. Hughes went to the State Police. Sullivan Decl. Ex. S, at 37:21-38:16. They commenced an investigation. Sullivan Decl. Ex. S, at 38:16-20.

In 1992, Witness Y's son was placed on probation and assigned to Luckey's caseload. Sullivan Decl. Ex. T, at 11:12-16; 18:11-12. Her son began to go to Luckey's home after school to do his homework. Sullivan Decl. Ex. T, at 16:3-25. Within a week or two of her son's assignment to Luckey, an older boy approached Y and told her that she needed to find her son another probation officer. Sullivan Decl. Ex. T, at 20:4-19. He would not elaborate. Sullivan Decl. Ex. T, at 20:4-19; 23:9-21. Y inquired with her son and he agreed that he would like to switch probation officers but did not express why. Sullivan Decl. Ex. T, at 20:20-24. Y and her son met with Ms. Crumrine and Y requested that a new officer be assigned to her son's case. Sullivan Decl. Ex. T, at 6-11. Ms. Crumrine asked the son whether he had a problem with Luckey and the boy quietly responded "no" while avoiding eye contact. Sullivan Decl. Ex. T, at 21:12-20. Y did not indicate why she wanted a reassignment. Sullivan Decl. Ex. T, at 22:2-12. Ms. Crumrine denied their request. Sullivan Decl. Ex. T, at 22:13-15.

Emmy Whitman worked for the County's juvenile probation department from 1991 to 1993. Sullivan Decl. Ex. L, at 10:21-11:1; 18:16. Ms. Whitman was partnered with Luckey and assisted him with a portion of his caseload. Sullivan Decl. Ex. L, at 13:12-25; 19:6-13. Ms. Whitman accompanied Luckey to Pitchford Boys Ranch, where Luckey would regularly comment on "what a beautiful body" one of the boys had. Sullivan Decl. Ex. L, at 40:14-41:14. Ms. Whitman describes Luckey's relationship with one particular probationer as "dysfunctional"

in that Luckey's attitude toward the boy swung between two extremes: threatening to send him to MacLaren and later calling him a great kid who deserved a break. Sullivan Decl. Ex. L, at 34:4-15. Ms. Whitman accompanied Luckey and this probationer to the shopping mall, where Luckey insinuated that he would buy him various presents if he behaved himself. Sullivan Decl. Ex. L, at 35:17-19; 38:22-39:6; 42:11-14. Ms. Whitman later learned that Luckey purchased expensive clothing and a bike for the boy. Sullivan Decl. Ex. L, at 35:17-19; 38:22-39:6; 41:22-24; 43:5-24. Ms. Whitman reported Luckey's conduct to his immediate supervisor, Marty Gruher. Sullivan Decl. Ex. L, at 50:4-15.

Mr. Gruher, who worked in the juvenile department from 1,975 to 1995, has no recollection of Ms. Whitman. Gruher Decl., at 2-4. He asserts that no one ever notified him that Luckey had an inappropriate relationship with his probationers until the events leading the Oregon State Police investigation took place. Gruher Decl., at 4. As far as he could tell, Luckey was handling his cases in a professional manner. Gruher Decl., at 2.

## LEGAL STANDARD

Summary judgment is appropriate if "the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the moving party fulfills its burden, the burden shifts to the non-moving party who must go

beyond the pleadings to identify genuine issues of fact. *Celotex Corp.*, 477 U.S. at 324. Conclusory allegations, unsupported by factual material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). Instead, the opposing party must, by affidavit or as otherwise provided by FED. R. CIV. P. 56, designate specific facts that show there is a genuine issue for trial. *Devereaux*, 263 F.3d at 1076.

The court must view the evidence in the light most favorable to the nonmoving party. *Szajer v. City of Los Angeles*, 632 F.3d 607, 610 (9th Cir. 2011). All reasonable doubt as to the existence of a genuine dispute of material fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981). However, facts must be "viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

The parties move for summary judgment on different legal bases. Defendant asserts all of Plaintiffs' claims are time-barred. Plaintiffs argue there is no triable issue of fact regarding Defendant's liability. For the sake of clarity, the Court will consider each motion separately.

### I.   Defendant's Motion for Summary Judgment

#### a.   State Law Claims

Defendant advances three reasons why Plaintiffs' claims under the Oregon Tort Claims Act ("OTCA") are untimely and should be dismissed. First, it argues Plaintiffs did not comply

with OTCA's notice requirements. Second, it alleges Plaintiffs failed to commence this action within the statute of limitations. And, finally, it invokes Oregon's statute of ultimate repose. Because Oregon's 10-year statute of ultimate repose for negligence actions serves as an absolute bar to Plaintiffs' state law claims, the Court need not assess Defendant's first two arguments.

The Oregon legislature enacts statutes of ultimate repose to supplement statutes of limitations and delineate the outer boundaries of timely litigation. *DeLay v. Marathon LeTourneau Sales & Serv. Co.*, 291 Or. 310, 315 (1981). A statute of ultimate repose sets a maximum time to file a claim and begins to accrue from the date of the relevant act or omission. *Josephs v. Burns*, 260 Or. 493, 498 (1971), *abrogated by Smothers v. Gresham Transfer, Inc.*, 332 Or. 83 (2001). Unlike a statute of limitations, the ultimate repose period runs regardless of whether an injury has been discovered — or even occurred — and despite a damaged party's inability to bring an action. *Shasta View Irrigation Dist. v. Amoco Chemicals Corp.*, 329 Or. 151, 162 (1999); *Josephs*, 260 Or. at 496. Even bad acts by a defendant do not toll a statute of repose in Oregon. *See Beals v. Breeden Bros.*, 113 Or.App. 566, 572 (1992) (holding "equitable estoppel is not available to avoid" the statute of ultimate repose for negligence claims because a contrary holding "would thwart the legislature's intent to provide an absolute cutoff date for the bringing of such actions."). Once the repose period expires, "the claim is extinguished and no legally cognizable injury exists." *Shasta View Irrigation Dist.*, 329 Or. at 162.

The OTCA does not contain a statute of ultimate repose itself. Instead, Or. Rev. Stat. § 30.265(6)(d) gives public bodies immunity from liability for "[a]ny claim that is limited or barred by the provisions of any other statute, including but not limited to any statute of ultimate repose." Pursuant to this provision, Defendant invokes Oregon's 10-year statute of ultimate repose for negligence claims. Or. Rev. Stat. § 12.115(1) ("In no event shall any action for

negligent injury to person or property of another be commenced more than 10 years from the date of the act or omission complained of."). Defendant asserts that the sexual abuse giving rise to Plaintiffs' claims ended, at the very latest, when Luckey died in 1994.[3] Assuming the 10-year repose period set forth in Or. Rev. Stat. § 12.115 began to accrue at that time, Plaintiffs' negligence claims became irrevocably barred in 2004.

Plaintiffs argue Or. Rev. Stat. § 12.117 exempts their claims from the negligence repose statute. In pertinent part, it provides:

> Notwithstanding ORS 12.110, 12.115 or 12.160, an action based on conduct that constitutes child abuse or conduct knowingly allowing, permitting or encouraging child abuse that occurs while the person is under 18 years of age must be commenced before the person attains 40 years of age, or if the person has not discovered the causal connection between the injury and the child abuse, nor in the exercise of reasonable care should have discovered the causal connection between the injury and the child abuse, not more than five years from the date the person discovers or in the exercise of reasonable care should have discovered the causal connection between the child abuse and the injury, whichever period is longer.

Or. Rev. Stat. § 12.117(1) (emphasis added). In short, the provision allows child abuse victims to bring claims before the age of 40 or within five years from the date of discovery regardless of whether the repose period has run.

However, Or. Rev. Stat. § 12.117 does not save Plaintiffs' claim. The Oregon Supreme Court has characterized the provision as a "statute of limitations for child abuse claims brought against private actors." *Doe 1 v. Lake Oswego School Dist.*, 353 Or. 321, 335-36 (2013) (emphasis added). It "does not generally apply to cases brought pursuant to the OTCA." *Jack Doe 1 v. Lake Oswego Sch. Dist.*, 242 Or.App. 605, 616 n.2 (2011) *rev'd sub nom. Doe 1 v. Lake Oswego Sch. Dist.*, 353 Or. 321 (2013).

The OTCA demands this exclusion. Or. Rev. Stat. § 30.275(9) provides:

---

[3] Most of the Plaintiffs allege that Luckey stopped abusing them before 1994 because they moved, transferred probation officers, finished probation, etc.

> Except as provided in ORS 12.120, 12.135 and 659A.875, but <u>notwithstanding any other provision of ORS chapter 12 or other statute providing a limitation on the commencement of an action</u>, an action arising from any act or omission of a public body or an officer, employee or agent of a public body within the scope of ORS 30.260 to 30.300 shall be commenced within two years after the alleged loss or injury.

(Emphasis added). The Oregon Supreme Court has held this "notwithstanding clause" overrides statutes of limitations that might otherwise apply in tort actions against public bodies. *Bell v. Tri-Cnty. Metro. Transp. Dist. of Oregon*, 353 Or. 535, 541 (2013). Or. Rev. Stat. § 12.117 falls within the clause's scope. *Doe 1*, 353 Or. at 335 (describing Or. Rev. Stat. § 12.117 as a "statute of limitations"). The Oregon Legislature explicitly excluded certain provisions from the clause's preeminence but opted not to exempt Or. Rev. Stat. § 12.117. Thus, Or. Rev. Stat. § 30.275(9) compels the conclusion that Or. Rev. Stat. § 12.117 does not apply in the OTCA context. *See Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). It follows that Or. Rev. Stat. § 12.117's repose exception cannot save Plaintiffs' state law claims. They are absolutely time-barred and Defendant is entitled to judgment as a matter of law.

The Court is troubled by this conclusion. "[T]his is a case in which the technically correct legal result does a great disservice to children." *Cooksey By & Through Cooksey v. Portland Pub. Sch. Dist. No. 1*, 143 Or.App. 527, 535 (1996) (Leeson, J., concurring). Or. Rev. Stat. § 12.117 accommodates delays in reporting that are "typical" in child sexual abuse cases. *Id.*; *see also Bonneau v. Centennial School Dist. No. 28J*, 666 F.3d 577, 578 (9th Cir. 2012) ("In the wake of concerns about delayed reporting of child abuse, Oregon, like a number of states, adopted a special statute of limitations for abuse victims."). It prevents a child abuse claim from

vanishing before the victim even recognizes the wrong, confronts repressed memories and feelings, or realizes the effects and manifestations of abuse. The Court struggles to understand why Oregon would afford this important protection to children who suffer at the hands of private perpetrators, but not survivors of public actors' abuse. However, "it is up to legislatures, not courts, to decide on the wisdom and utility of legislation." *Ferguson v. Skrupa*, 372 U.S. 726, 729 (1963). This Court will not substitute its judgment for that of the Oregon legislature.

### b. Federal Law Claims

42 U.S.C. § 1983 does not provide a statute of limitations. Instead, it allows courts to borrow statutes of limitations from congruent state laws. *Lukovsky v. City & Cnty. of San Francisco*, 535 F.3d 1044, 1048 (9th Cir. 2008). The Ninth Circuit characterizes Section 1983 claims as personal injury actions for statute of limitations purposes. *Davis v. Harvey,* 789 F.2d 1332, 1333 (9th Cir. 1986). Accordingly, Oregon's 2-year personal injury statute of limitations governs Plaintiffs' Section 1983 claims. Or. Rev. Stat. § 12.110(1).

Courts look to federal, not state, law to determine when a Section 1983 claim accrues. *Wallace v. Kato,* 549 U.S. 384, 388 (2007). Under federal law, a claim accrues — or, put differently, the statute of limitations begins to run — when "the plaintiff knows or has reason to know of the injury." *TwoRivers v. Lewis,* 174 F.3d 987, 991 (9th Cir. 1999). The Ninth Circuit has held "a claim accrues not just when the plaintiff experiences the injury, but when the plaintiff knew or in the exercise of reasonable diligence should have known of the injury and the cause of that injury." *Bonneau*, 666 F.3d at 581 (internal quotations omitted).

Here, Plaintiffs claim two kinds of injuries: physical and psychological. As juveniles, they were molested by Luckey. Separate and distinct from their childhood bodily injuries, Plaintiffs allege they have suffered lifelong psychological damage as a result of that abuse.

Plaintiffs testify that they did not, and had no reason to, realize the causal connection between Luckey's cruelty, Defendant's inaction, and their enduring emotional problems until shortly before filing suit. In support of this contention, Plaintiffs submit clinical opinions that each plaintiff failed to connect his psychological struggles to Luckey's abuse until well into adulthood as well as expert materials indicating that such delays are normal for victims of child sexual abuse. Plaintiffs urge the Court to find these recent discoveries delayed the accrual of their federal claims.

Defendant relies heavily on the Ninth Circuit's opinion in *Bonneau* to support its position that the clock began to run when Plaintiffs were last molested by Luckey or, alternatively, when they reached the age of majority. The plaintiff in *Bonneau* claimed teachers beat him when he was an elementary school student. *Id.* at 579. The Ninth Circuit found the plaintiff's claim accrued at the time of the alleged beatings because the plaintiff was aware of his injuries and their cause, immediately reported the beatings to adults, and plead no "belatedly discovered" injuries to warrant delayed accrual. *Id.* at 581.

Many key facts distinguish Plaintiffs' case from *Bonneau*. First and foremost, Plaintiffs allege precisely the kind of "belatedly discovered" damages that the *Bonneau* opinion noted might require a delay in accrual. *Id.* Plaintiffs offer evidence that they suffer psychological problems that they only recently realized are linked to their childhood trauma. The Ninth Circuit has held similar delays in discovery to be reasonable. In *O'Connor v. Boeing North American, Inc.*, 311 F.3d 1139, 1150-51 (9th Cir. 2002), the Ninth Circuit explained a person may reasonably fail to investigate possible negligent causes of an injury if there are many other potential natural causes. Here, Plaintiffs struggle with substance abuse, depression, anxiety, aggression, and relationship issues. Many people face these same problems and have no related

legal claims. Oftentimes, there is no external party to blame for a person's struggles with addiction, anger, or sadness. In light of the many possible ordinary and innocent causes of Plaintiffs' adult problems, a jury could find Plaintiffs were justified in failing to immediately suspect Defendant bore any responsibility.

Second, the abuse alleged by Plaintiffs is not analogous to the beatings suffered by the plaintiff in *Bonneau*. Plaintiffs allege Luckey trapped them in an ongoing sexually abusive relationship. They testify that Luckey repeatedly raped them, touched them inappropriately, and compelled them to fondle him. All the while, Luckey manipulated the boys: oscillating between the role of caretaker and attacker. He would threaten to send the boys away but then show them affection and care: giving them gifts, taking them to dinner, taking them on trips, etc. Dissimilarly, *Bonneau* involved isolated physical attacks. No related threats or emotional abuse was alleged. Moreover, the teachers' harmful contact was non-sexual. It did not generate any confusing sensations of arousal for the child plaintiff. Quite simply, the injuries at issue in *Bonneau* and the injuries alleged by Plaintiffs are different. The Ninth Circuit's analysis in *Bonneau* is not conclusive here.

Finally, unlike the plaintiff in *Bonneau*, Plaintiffs did not disclose Luckey's abuse until they were grown men. The Ninth Circuit found the fact that the plaintiff in *Bonneau* "immediately confided in other teachers and his parents" weighed in favor of finding that he was aware of his injuries and their cause. *Bonneau*, 666 F.3d at 581. It follows that Plaintiffs' longstanding silence could support the delayed accrual of their claims.

In conclusion, though one could reasonably infer Plaintiffs knew or should have known the facts critical to their claim against Defendant long before they filed suit, the Court is not

convinced that a reasonable person must so infer.[4] "[W]hat [Plaintiffs] knew and when they knew it are questions of fact." *Simmons v. United States*, 805 F.2d 1363, 1368 (9th Cir. 1986). Reasonable minds could disagree on when Plaintiffs' Section 1983 claims accrued. Summary judgment on this basis should be denied.

## II.    Plaintiffs' Motion for Summary Judgment

Plaintiffs ask the Court to rule as a matter of law in their favor regarding Defendant's liability. As explained in the section above, Plaintiffs' state law claims are time-barred. Therefore, the Court will only analyze Plaintiffs' summary judgment motion in regards to their remaining federal claim.

Section 1983 provides a mechanism for vindicating federal rights. *Gonzaga University v. Doe*, 536 U.S. 273, 284-85 (2002). Plaintiffs invoke Section 1983 to enforce their right to be free from "state-imposed violations of bodily integrity" which includes the "right to be free from sexual abuse." *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997). Plaintiffs present extensive uncontested evidence that they were deprived of this right.

It is well settled that a municipality, like Defendant, is only liable under Section 1983 for its "<u>own</u> illegal acts." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original). Defendant cannot be held vicariously liable for constitutional violations committed by Luckey simply by virtue of his employment. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). To impose Section 1983 liability on Defendant, Plaintiffs must show Defendant had an unconstitutional policy, custom, or usage that caused their injuries. *Id.* at 694 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose

---

[4] Each Plaintiff presents a different story of abuse. Their claims likely accrued at different times. Accordingly, a jury could find some Plaintiffs' claims are time barred while others are not.

edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.").

Plaintiffs assert their injuries stem from Defendant's policy of omission. Defendant allowed Luckey continued access to probationers despite his open violations of the juvenile department's code of conduct. Inaction may constitute an official policy triggering Section 1983 liability if it evidences "deliberate indifference" to obvious consequences. *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 406-07 (1997). Deliberate indifference is a high standard of fault. The need for action must be "so obvious" and the "inadequacy so likely to result in the violation of constitutional rights" that the municipality's failure to act can be properly characterized as deliberate indifference to affected rights. *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390 (1989).

Whether Defendant's inaction amounted to deliberate indifference depends on whether it "was on actual or constructive notice that its omission would likely result in a constitutional violation." *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1186 (9th Cir. 2002). Plaintiffs present circumstantial evidence that Defendant was aware Luckey had unprofessional relationships with his probationers. The record paints a picture of a man openly flouting Defendant's rules — rules created, in part, to prevent child sexual abuse. Def.'s Resp., at 65. Plaintiffs testify that Luckey molested them in public: at the movie theatre, in the locker room of an athletic club, in Luckey's car. Defendant's employees and others within the community regularly saw Luckey out to eat and at the mall with young boys. Luckey checked probationers out of juvenile facilities for overnight and weekend trips. Boys slept over and, in some cases, lived at Luckey's home. People working for Defendant and within the small local juvenile system were suspicious of Luckey's interest in male youth and perceived sexual overtones in his

conduct. Luckey made inappropriate comments to co-workers about probationers' physiques. He acted as though he was courting certain boys. Parents shared concerns about Luckey with Defendant's officials. One person testifies that she alerted the County district attorney's office to reports that Luckey was molesting probationers. In response, Defendant offers testimony from Luckey's supervisors and various County officials — including persons whom Plaintiffs' witnesses testify they reported their concerns to — that they had no notice of Luckey's misconduct until allegations surfaced publicly and a state investigation was commenced.

On this record, a jury could find the risk of sexual abuse was so obvious that Defendant's failure to enforce its rules of conduct amounted to deliberate indifference to the rights of probationers. However, the Court is not convinced that this is the only reasonable conclusion. Whether Defendant had a policy of deliberate indifference that emboldened Luckey and facilitated his abuse of Plaintiffs is a question best left for the jury. *Oviatt By & Through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992) ("Whether a local government entity has displayed a policy of deliberate indifference is generally a question for the jury.").

In addition to proving "deliberate indifference," Plaintiffs must "establish an affirmative link" between Defendant's failure to act and their deprivations of liberty. *Id.* This is not a demanding standard. It is enough if "the identified deficiency . . . [is] closely related to the ultimate injury." *Canton*, 489 U.S. at 391. Plaintiffs submit evidence that Luckey sexually abused probationers while engaging in contacts prohibited by Defendant's rules of conduct. If Defendant had enforced its rules against Luckey and required him to maintain a professional distance from his probationers, it is likely that at least some of the alleged abuse could have been avoided. This is a sufficient nexus to support a jury finding that Defendant's policy of inaction was a moving force behind Plaintiffs' injuries.

In sum, the record is ripe with issues of material fact regarding Defendant's liability for Plaintiffs' constitutional injuries. A finder of fact must assess whether Defendant's failure to act constituted deliberate indifference to its probationers' right to be free from sexual abuse or, rather, simply demonstrates that Defendant had no notice of the need to act. Accordingly, the Court should deny Plaintiffs' motion for summary judgment on their Section 1983 claims.

## RECOMMENDATION

Based on the foregoing, the Court should Court should DENY Plaintiffs' motion for partial summary judgment (#167); GRANT Defendant's summary judgment motions (#144, #146, #150, #153, #162, #171, #173, #175, #177) as to Plaintiffs' state law claims but DENY Defendant's motions as to Plaintiffs' federal claims; and DENY Plaintiffs' motion to strike (#268).

This Report and Recommendation will be referred to a district judge. Objections, if any, are due no later than fourteen (14) days after the date this recommendation is filed. If objections are filed, any response is due within fourteen (14) days after the date the objections are filed. *See* FED. R. CIV. P. 72, 6. Parties are advised that the failure to file objections within the specified time may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED this _____ day of March 2015.

_____
MARK D. CLARKE
United States Magistrate Judge